UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VERITAS OPERATING CORPORATION, a Delaware corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>        Defendant.<br>_____<br>MICROSOFT CORPORATION, a Washington corporation,<br><br>        Counterclaim Plaintiff,<br><br>   v.<br><br>VERITAS OPERATING CORPORATION, a Delaware corporation, and VERITAS SOFTWARE CORPORATION, a Delaware corporation,<br><br>        Counterclaim Defendants. | CASE NO. C06-0703-JCC<br><br>ORDER |

ORDER – 1

1    This matter comes before the Court on Defendant/Counterclaim Plaintiff Microsoft Corporation
2    (Microsoft)'s Motion for Summary Judgment Regarding Veritas' Claims for Breach of Contract (Dkt.
3    No. 210), Veritas Operating Corporation (Veritas)'s Response opposing the motion (Dkt. No. 291), and
4    Microsoft's Reply (Dkt. No. 333). The Court has carefully considered these papers and their supporting
5    declarations and exhibits and has determined that oral argument is not necessary. The Court hereby
6    DENIES IN PART and GRANTS IN PART the motion and rules as follows.

**I.     BACKGROUND**

In its broadest sense, this complicated contract dispute centers on the question of whether Microsoft denied Veritas the benefit of its bargain by using Veritas' confidential information related to volume management computer technology in violation of Microsoft's various contractual obligations not to compete with Veritas.

Over a decade ago, when the ill-fated business relationship between these parties began in 1996, Veritas had a strong reputation for providing high-end volume management technology suitable for business servers. (Def.'s Mot. 2 (Dkt. No. 210 at 3).) Such technology "allows data to be stored reliably and manipulated uniformly without regard to potential differences in physical storage devices, essential to the data storage needs of many medium and large business enterprises." (Compl. ¶ 9 (Dkt. No. 1 at 4).) Microsoft, for its part, had already released its first server operating system, Windows NT, with its own "rudimentary" technology for storage management, called FT Disk. (*Id.* ¶ 10 (Dkt. No. 1 at 4–5).) Microsoft recognized that its volume management technology was not serving the needs of high-end business customers and decided that rather than invest in further development of FT Disk, "it would be better off capitalizing on Veritas' reputation" because "customers would be more likely to buy servers running the Windows operating system if Veritas' high end volume management products were available for Windows[.]" (Def.'s Mot. 2 (Dkt. No. 210 at 3).) At that time, Veritas' volume management technology was available only for Unix-based operating systems. (*Id.*)

With that expectation, Microsoft approached Veritas with the idea of joining forces. On August

ORDER – 2

19, 1996, the parties entered a development and license agreement ("Agreement") whereby Veritas promised to provide Microsoft with the source code for its volume management technology, called Logical Disk Manager (LDM), to be embedded in the next version of the Windows NT operating system, Windows NT 5.0, later renamed Windows 2000. (Agreement (Dkt. No. 211-2).) Veritas' express objective in entering the Agreement with Microsoft was "to build a Windows NT Add-on products business[.]" (*Id.* at 1 (Dkt. No. 211-2 at 2).) In other words, Veritas planned to develop and market to Windows customers certain volume management-related features, or increased capabilities, that were not included in the base LDM to be embedded in Windows 2000. (*Id.* Original Exhibit A § 2.3 (Dkt. No. 211-3 at 5).)

Section 2.3 of Exhibit A to the Agreement listed certain features that were to be included in the Veritas Add-on product. (*Id.*) Additionally, Appendix A-1 attached to the Agreement contained a chart that identified certain features and designated whether the feature existed or would be included in the current Windows NT 4.0 (using FT Disk) or the upcoming Windows NT 5.0 (using the embedded product), or whether such feature was to be included in the Veritas Add-on product. (*Id.* Appendix A-1 (Dkt. No. 211-3 at 11).) Veritas takes the position that the Agreement thus specifically reserved certain features to be the exclusive province of Veritas for developing and marketing to Windows users. (Compl. ¶ 13 (Dkt. No. 1 at 6).) The Agreement restricted Microsoft's ability to use Veritas' confidential information, including its source code, to create competing products. (Agreement § 12.3 (Dkt. No. 211-2 at 16); Amendment § 12.3 (Dkt. No. 211-4 at 6–7).) Microsoft was specifically prohibited from using Veritas' confidential information, including its source code, to develop replacements for the embedded LDM. (Agreement § 12.2 (Dkt. No. 211-2 at 16); Amendment §§ 12.3, 12.8 (Dkt. No. 211-4 at 6–8).)

Because Veritas' existing volume management software was Unix-based, rather than Windows-based, work remained to be completed before the product could be made available to Windows customers. (Def.'s Mot. 2 (Dkt. No. 210 at 3).) In order to facilitate this work under the time pressure imposed by Microsoft's Windows 2000 shipping date, Veritas converted (or "ported") the majority of its

ORDER – 3

1  copyrighted volume management source code, rather than just the necessary components, so that
2  Microsoft and Veritas engineers could quickly integrate LDM with Windows. (*Id*.; Compl. ¶ 18 (Dkt.
3  No. 1 at 7).) The source code ported and shared with Microsoft included disabled portions of code that
4  related to Add-on features subject to the restrictions in the Agreement. (Compl. ¶ 19 (Dkt. No. 1 at 8).)
5  Thus, Microsoft developers would have been able to see Veritas' confidential source code for existing
6  Add-on capabilities, even though the embedded product would not perform such functions.

7       Under the Agreement, Microsoft was permitted to make changes to Veritas' code for the
8  purposes of bug-fixing and integration with Windows. (Agreement § 2.1.3 (Dkt. No. 211-2 at 5).)
9  Microsoft was not permitted, however, to make changes that would "result in changes to the Defined
10 Interface or feature listing." (*Id*. § 3.5 (Dkt. No. 211-2 at 7).) Maintaining the "defined interface" was
11 necessary for Veritas to be able to make compatible Add-ons. Microsoft also agreed to deliver to Veritas
12 any modified code, to ensure that Veritas could continue to develop compatible Add-ons. (*Id*.)

13      The parties diverge in their accounts as to the quality of Veritas' contribution in making LDM
14 suitable for shipment in Windows 2000. Veritas claims that Microsoft's tests of LDM showed that
15 Microsoft was "impressed that the LDM code base and UI worked as well as it did" in 1998. (Pl.'s Resp.
16 7 (Dkt. No. 291 at 10).) Veritas asserts also that a "significant number of Veritas developers and testers
17 worked on the LDM code until the end to ensure a successful release for Windows 2000." (*Id*. at 8 (Dkt.
18 No. 291 at 11).) Microsoft, however, argues that Microsoft "expressed deep dissatisfaction with the
19 quality of Veritas' engineering" and "expended far more engineering resources than should have been
20 necessary in fixing and improving LDM, first in the push to get a marginally adequate version shipped in
21 Windows 2000, and later to make the changes in its basic engineering necessary to properly integrate it
22 with Windows[.]" (Def.'s Mot. 3, 7 (Dkt. No. 210 at 4, 8).)

23      One way or another, on December 15, 1999, Microsoft released Windows 2000, containing the
24 embedded LDM. (*Id*. at 8 (Dkt. No. 210 at 9).) On December 17, 1999, the parties amended the
25 Agreement. (*Id*.) The amendment, according to Microsoft, "acted as a 'performance improvement plan'
26 ORDER – 4

for Veritas, setting standards for the quality of Veritas' engineers and imposing deadlines for Veritas' achievement of milestones in developing the add-ons." (*Id.*) Microsoft asserts that the amendment also removed the restrictions on Microsoft's ability to change the LDM code and to create new features that previously were reserved for Veritas. (*Id.*) Veritas argues that Microsoft knew that the amendment did not change "the existence of reserved features after the shipment of Windows 2000[.]" (Pl.'s Resp. 13 (Dkt. No. 291 at 16).)

In 2002, Microsoft attempted to rework the amended Agreement, as well as two other of the parties' agreements that in sum defined the parties' existing business relationship. (Pl.'s Resp. 10 (Dkt. No. 291 at 13); Framework Agreement Recitals (Dkt. No. 296-6 at 55).) Veritas claims that "[u]nbeknownst to Veritas, by that time Microsoft was well on its way to using Veritas' Confidential Information to develop a replacement for LDM, which became known as LVM." (*Id.*) As part of the "Framework" negotiations between the parties that took place over the course of the next two years, according to Veritas, "Microsoft proposed obtaining (a) an unfettered license to both Veritas' Embedded Product source code and certain other Veritas source code . . . and (b) a broad retroactive license to all of Veritas' intellectual property, providing a release of all potential claims by Veritas for Microsoft's prior breaches and misuse of Confidential Information." (Pl.'s Resp. 11 (Dkt. No. 291 at 14).) The negotiations ended in impasse. (Def.'s Mot. 12 (Dkt. No. 210 at 13).) Meanwhile, Microsoft continued make improvements to the LDM code for the release of Windows Server 2003, in April 2003. (Pl.'s Resp. 8 (Dkt. No. 291 at 11–12).)

On April 9, 2004, Microsoft exercised its buy-out rights under Section 5.3 of the Agreement. (Def.'s Mot. 12 (Dkt. No. 210 at 13).) Microsoft claims that this buy-out gave Microsoft "expansive rights to the Embedded Product," including the right to make additions to it. (Def.'s Mot. 12 (Dkt. No. 210 at 13).) Veritas claims that the buy-out did not authorize Microsoft to use Veritas' confidential information to create a supplanting product or to create features reserved to Veritas. (Pl.'s Resp. 26 (Dkt. No. 291 at 29).) If the buy-out did give Microsoft such rights, Veritas argues, there would have

ORDER – 5

been no need for Microsoft to attempt to negotiate for those rights during the failed Framework negotiations. (*Id*.)

In May 2004, Microsoft released to Veritas and other companies attending the Windows Hardware Engineering Conference (WinHEC) an early, binary version of LVM, the volume management technology to be embedded in the newest client version of Windows, called Windows Vista (then named Longhorn), and Windows Server 2008. (Def.'s Mot. 3, 13 (Dkt. No. 210 at 4, 14); Compl. ¶ 27 (Dkt. No. 1 at 11).) Veritas claims that in Vista, "Microsoft improperly included code implementing a number of features that the Agreement exclusively reserved for Veritas Add-on Products." (Compl. ¶ 28 (Dkt. No. 1 at 12).) These included VDS ("a common interface for hardware and software RAID volumes") and VSS ("a common interface for hardware-based snapshots"). (*Id*.) Additionally, according to Veritas, LVM was a supplanting product that impermissibly replaced LDM because it was based on Veritas' confidential information. (Compl. ¶ 37 (Dkt. No. 1 at 15).)

Microsoft argues that LVM is not a supplanting product but instead, a "much-improved, upgraded Embedded Product." (Def.'s Mot. 3 (Dkt. No. 210 at 4).) Further, Microsoft argues, such improvements were permitted under the Agreement so long as Microsoft retained compatibility with the Veritas Add-ons by maintaining the Defined Interfaces. (*Id*. at 2 (Dkt. No. 210 at 3).) Microsoft asserts also that after the Agreement was amended, no features were reserved exclusively for Veritas. (*Id*. at 4 (Dkt. No. 210 at 5).) According to Microsoft, after December 15, 2000, the Agreement gave Microsoft the right to include any Add-on features in LVM. (*Id*. at 4 (Dkt. No. 210 at 5).) Alternatively, Microsoft argues, even if such features were reserved, no such features exist in LVM. (*Id*.)

In July 2005, Veritas was acquired by Symantec. (Def.'s Mot. 14 (Dkt. No. 210 at 15).) In May 2006, Veritas filed the instant lawsuit, claiming, *inter alia*, that Microsoft violated the Agreement and committed an array of tortious acts by developing LVM using Veritas' confidential information. (Compl. (Dkt. No. 1).) Microsoft now asks the Court to dismiss two of Veritas' breach of contract claims as a matter of law: "(1) that Microsoft included volume management 'features' in its operating system that the

ORDER – 6

1  Agreement 'reserved' for Veritas; and (2) that LVM is a 'Supplanting Product' that uses Veritas'
2  Confidential Information in breach of contract limitations." (Def.'s Mot. 15 (Dkt. No. 210 at 16).)
3  Microsoft also argues that the Agreement's limitation of liability provision bars Veritas' recovery of lost
4  profits, and that Veritas' damages, if any, are capped at $ 4 million. (*Id*. at 28 (Dkt. No. 210 at 29).)[1]

## II.  APPLICABLE STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the moving party meets this initial burden, then the party opposing the motion must set forth facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630. He or she must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "In response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, . . . which for the purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); FED. R. CIV. P. 56(e). If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

---

[1] Additionally, Microsoft asserts that Veritas' tort claims are barred by the Economic Loss Rule. (*Id*.) Because the parties have briefed the tort claims issue more fully as related to Microsoft's motion for summary judgment on Counts I, III–V, VII (Dkt. No. 212), the Court will address that issue in the Order addressing that motion.

ORDER – 7

Additionally, "[u]nder Washington law, contract interpretation is governed by the 'context rule,' of the Restatement (Second) of Contracts §§ 212, 214(c) (1981)." *Verizon Nw. Inc. v. Worldcom, Inc.*, 61 F. App'x 388, 392 (9th Cir. 2003) (citing *Berg v. Hudesman*, 801 P.2d 222, 229–30 (Wash. 1999)). "In contrast to the 'plain meaning' rule, the 'context rule' permits a court to look at extrinsic evidence to discern the meaning or intent of words or terms used by contracting parties, even when the parties' words appear to the court to be clear and unambiguous." *Id*. Such extrinsic evidence can include "the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1118 (9th Cir. 2001). Further, a "question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an agreement is to be determined as a question of law." *Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990).

### III.   ANALYSIS

#### A.   Whether Microsoft Breached the Agreement by Including Features in Vista and Windows Server 2008 that are Exclusively Reserved to Veritas

Veritas claims that Microsoft breached the Agreement by "including features in its operating system products that are exclusively reserved for Veritas[.]" (Compl. ¶ 63 (Dkt. No. 1 at 23).) Microsoft disputes this issue on the basis that the 1999 amendment to the Agreement obliterated any notion that certain features were exclusively reserved for Veritas. (Def.'s Mot. 4 (Dkt. No. 210 at 5).) Microsoft argues alternatively that even if certain features were still reserved for Veritas, no such features exist in Vista or Windows Server 2008. (*Id*.) The latter question of whether LVM, VDS, or VSS include certain features requires expert testimony and a complex evaluation of code, and as such, the Court finds the issue inappropriate for disposal at the summary judgment stage.

In arguing that the amendment eliminated any reservation of features to Veritas, Microsoft relies

ORDER – 8

upon the Agreement's sections 1.2 (referring to Exhibit A); the amendment's deletion of Exhibit A; amended section 3.4, ending a stand-back period regarding enhancements on December 15, 2000; and the absence of any claim that Microsoft included reserved features before December 15, 2000.

Section 1.2 defines the "embedded product" that was to be included in the Microsoft operating system:

> "Embedded Product" means a subset of the VM Software or any successor or replacement product which subset is adapted for inclusion in the MICROSOFT System Product. Such subset will be *limited to features and capacities as specified in the description of the Embedded Product in Exhibit A*. The Embedded Product includes substantial VERITAS Add-on Product code (the "VERITAS Add-on Product Code Subset"). *Exhibit A may be amended by mutual agreement of MICROSOFT and VERITAS as per the terms of this Agreement*. The Embedded Product shall include all subsets of the VM software or successor or replacement products thereof meeting the foregoing description.

(Agreement § 1.2 (Dkt. No. 211-2 at 3) (emphasis added).) The original Exhibit A, referred to in this section, is a nine-page "overview" of the volume management software, the embedded product, and Veritas Add-on products. (Dkt. No. 211-3.)  Exhibit A, in turn, refers to Appendix A-1, which contains "details on volume management capabilities." (Agreement Original Exhibit A § 2.5 (Dkt. No. 211-3 at 6).) Appendix A-1 is a chart that names and describes certain features, and states whether each feature is or will be contained in Microsoft's operating system Windows NT 4.0 (using FT Disk), in the embedded product in Windows NT 5.0 (Windows 2000), or in a Veritas Add-on. (Appendix A-1 (Dkt. No. 211-3 at 11).) It is this chart from whence Veritas derives its reservation of features. (Pl.'s Resp. 19 (Dkt. No. 291 at 22).)

Microsoft argues that per the 1999 amendment, the original Exhibit A referred to in section 1.2 was deleted and replaced by a new Exhibit A (Dkt. No. 211-4 at 11), thereby eliminating any reservation to Veritas of any features. (Def.'s Mot. 8 (Dkt. No. 210 at 9).) The Court is not persuaded by this argument, since the replacement Exhibit A clearly refers to Appendix A-1 and moreover states that Appendix A-1 "provides a matrix that compares features of the Windows NT 4.0 FT disk driver, the Embedded Product in Windows 2000, and *contemplated features for the Veritas Add-On*." (New Exhibit

ORDER – 9

A (Dkt. No. 211-4 at 12) (emphasis added).) The statement is in the present tense, indicating that the parties considered the Appendix to remain a viable part of the amended contract. Confirming this proposition, a May 2000 email from Microsoft software developer Catherine van Ingen shows that at that time, Microsoft still treated Appendix A-1 as relevant: "We should talk more in the June time frame about possibly migrating features from Appendix A-1 to the embedded product." (Def.'s Mot. 10 (Dkt. No. 210 at 11).) Van Ingen also stated in a June 2000 email that "Exhibit A-1 features are no-nos." (Pl.'s Resp. 2 (Dkt. No. 291 at 5).)

Microsoft argues that Appendix A-1 refers only to features that would be reserved to Veritas during the time frame leading up to Windows 2000, not in later Windows operating systems. (Def.'s Mot. 17 (Dkt. No. 210 at 18).) The Court is not persuaded by this argument because section 1.5 of the amended Agreement, which establishes the definitions and therefore the scope of the entire Agreement, defines the term "Microsoft System Product," referred to in section 1.2 above, as including Microsoft Windows 2000 and "updates and new releases[.]" (Amendment § 1.5 (Dkt. No. 211-4 at 2).) Therefore, whatever restrictions applied to Microsoft regarding the embedded product and Add-ons as to Microsoft Windows 2000 applied with equal force to later releases of the Windows operating system, including Windows Vista and Windows Server 2008.

Microsoft argues that irregardless of the viability of Appendix A-1, the amended section 3.4 allowed Microsoft to develop and distribute any features, including those listed in Appendix A-1. (Def.'s Mot. 18 (Dkt. No. 210 at 19).) Section 3.4 states that:

> For a period from the Amendment Date [December 17, 1999] until one year after the RTM [release to manufacture] of Windows 2000 [December 15, 2000], MICROSOFT shall be entitled to distribute only those Enhancements necessary for (i) fixing bugs or errors in the Embedded Product or (ii) integration (or improved integration) with the Windows 2000 operating system kernel. *After such period, MICROSOFT shall be entitled to distribute any and all Enhancements made by or for MICROSOFT.*

(Amendment § 3.4 (Dkt. No. 211-4 at 3) (emphasis added).) In section 1.3, the parties define "Enhancements" as "improvements *and new features* developed for inclusion in the Embedded Product."

ORDER – 10

(Agreement § 1.3 (Dkt. No. 211-2 at 3) (emphasis added).) This language standing alone does suggest that Microsoft was allowed to distribute new features to the embedded product after December 15, 2000. However, the contract must be read in its entirety. In section 2.1.3, which the parties did not amend and thus which remained in force after 1999, Veritas granted Microsoft the right to

> modify the source code of the Embedded Product for the purposes of fixing bugs, creating integration and consistency with the other components of the MICROSOFT System Product, adjusting to MICROSOFT or industry programming standards that MICROSOFT adopts, and tuning of performance, *provided that such modifications shall not result in creation of new features* or material changes (i.e., changes that prevent compatibility with the VERITAS Add-on Products) to the then-current Defined Interface[.]

(Agreement § 2.1.3 (Dkt. No. 211-2 at 5) (emphasis added).) Further, and perhaps more importantly, section 3.3, which also remained in effect after the amendment, required Microsoft to seek Veritas' consent before it "migrate[d] features from the Veritas Add-on Products to the Embedded Product[.]" (Agreement § 3.3 (Dkt. No. 211-2 at 6).) Thus, it is not entirely clear from the language of the contract whether the parties intended by the amended section 3.4 to allow Microsoft to add new features after December 15, 2000, that were previously reserved to Veritas.

The parties' actions clearly do not support such an interpretation. Because of the context rule, the Court may look to extrinsic evidence that does not contradict the terms of the agreement. There is abundant evidence that Microsoft believed certain features were still reserved for Veritas after December 15, 2000. For example, in a February 2002 email to van Ingen, Microsoft employee Sara Schumacher referred to "contractual restrictions on LVM functionality" and noted four features (hot spare, grow mirrors, N-way mirrors, and striping with parity) that were allegedly reserved to Veritas in Appendix A-1, as "functions we cannot build into the UI[.]" (Schumacher Email Feb. 7, 2002 (Dkt. No. 296-6 at 85).) Additionally, in a June 2002 internal Microsoft presentation on LVM development for Windows Vista and Server 2008, Cristian Teodorescu, one of Microsoft's primary developers of the LVM code, stated that as to "New Features," "[t]he design accommodates some features banned by our contract with Veritas. Shipping such features is subject to contract limitations." (Presentation Slide 647 (Dkt. No. 296-

ORDER – 11

7 at 29).) Further, a December 2004 email from Teodorescu states that "extending spanned/RAID-5/mirrored volumes is on the list of features reserved for VRTS." (Teodorescu Email Dec. 16, 2004 (Dkt. No. 296-7 at 41).) Moreover, the fact that Microsoft was willing to remove eleven of the new features when confronted by Veritas is some evidence, even if ultimately not conclusive, that Microsoft believed it did not have the legal right to include such features in Vista and Windows Server 2008. (Def.'s Mot. 14 (Dkt. No. 210 at 15); Pl.'s Resp. 15 (Dkt. No. 291 at 18).)

In sum, Veritas has raised at least a genuine issue of material fact as to whether Microsoft breached the Agreement by including features in Vista and Windows Server 2008 that are exclusively reserved to Veritas. Accordingly, the Court denies Microsoft's motion as to that issue.

### B. Whether Microsoft Impermissibly Used Veritas' Confidential Information to Develop LVM, VDS, and VSS

Veritas alleges that Microsoft impermissibly used Veritas' confidential information to develop LVM, as well as two features called VDS and VSS. (Compl. ¶¶ 29, 42, 43, 63 (Dkt. No. 1 at 12, 17, 23).) Microsoft disputes this charge on the basis that LVM is not a "Supplanting Product" that misuses Veritas' confidential information but is rather an enhanced embedded product that permissibly modifies Veritas' LDM code. (Def.'s Mot. 18–25 (Dkt. No. 210 at 19–26).) Additionally, Microsoft argues, VSS and VDS use LDM/LVM code only to the extent that linkage with LVM is necessary, allegedly a permissible use authorized by Veritas. (*Id.*. at 26 (Dkt. No. 210 at 27).) Microsoft argues that moreover, even if LVM is a supplanting product, after Microsoft exercised its buy-out rights under section 5.3 of the Agreement, Microsoft was permitted to use the LDM code for any purpose, even making derivative works. (*Id.* at 25 (Dkt. No. 210 at 26).)

Under the Agreement, Veritas authorized Microsoft to:

> modify the source code of the Embedded Product for the purposes of fixing bugs, creating integration and consistency with the other components of the MICROSOFT System Product, adjusting to MICROSOFT or industry programming standards that MICROSOFT adopts, and tuning of performance, provided that such modifications shall not result in creation of new features or material changes (i.e., changes that prevent compatibility with the VERITAS Add-on Products) to the then-current Defined

ORDER – 12

Interface[.]

(Agreement § 2.1.3 (Dkt. No. 211-2 at 5).) Microsoft was also permitted to enhance the Embedded Product, provided that it notified Veritas, gave Veritas the opportunity to "comment on the planned Enhancement[,]" and provided Veritas with the modified code and programmer's notes so that Veritas could make compatible Add-ons. (Agreement § 3.1 (Dkt. No. 211-2 at 6).) Such modifications were allowed as long as they did not "result in changes to the Defined Interface or feature listing." (Agreement § 3.5 (Dkt. No. 211-2 at 7).) In addition, Microsoft was permitted to develop a Supplanting Product (ie. "software code which replaces substantial portions of or the entire Embedded Product") if it provided Veritas written notice of its intent to develop one. (Agreement §§ 1.8, 5.2 (Dkt. No. 211-2 at 4, 8).) However, the Agreement expressly prohibited Microsoft's use of "VERITAS Confidential Information to create a supplanting product." (Agreement § 12.2 (Dkt. No. 211-2 at 16).)

The Court finds that the questions of whether LVM is a "Supplanting Product" or just an improved version of LDM, and whether Microsoft used Veritas' confidential information to develop it, are not questions appropriate for resolution at the summary judgment stage. As Microsoft has acknowledged, determining to what extent Microsoft included or relied upon LDM code in developing LVM requires a comparison of LDM and LVM code. (Def.'s Second Supplemental Resp. to Veritas' Interrog. No. 6 ( Dkt. No. 296-6 at 44).) "Performing such a comparison is a complex and time-consuming task that only an expert can perform. LDM and LVM each consist of over 100,000 lines of code." (*Id*.) Weighing the parties' respective expert testimony as to this question is properly left to the jury. Likewise, the question of whether and to what extent VDS and VSS use LDM or LVM code is a factual issue subject to the evaluation of experts, and such expert testimony will need to be weighed by the fact-finder.

Further, the Court is not persuaded by Microsoft's argument that so long as LVM maintained the Defined Interfaces, it was not a supplanting product. (Def.'s Mot. 21 (Dkt. No. 210 at 22).) The contract definition of "Supplanting Product" nowhere includes this characterization. The mere fact that the

ORDER – 13

Agreement permitted enhancements that did not alter the defined interfaces or create new features does not logically mean that so long as the Defined Interfaces are maintained, Microsoft has not created a Supplanting Product. Moreover, Veritas disputes whether LVM does, in fact, maintain the Defined Interfaces, particularly in Windows Server 2008. (Pl.'s Mot. 25 (Dkt. No. 291 at 28).) Therefore, there is a disputed issue of material fact as to this issue.

Nor is the Court persuaded by Microsoft's argument that after the buy-out, it was free to use the LDM code in any manner it wished. Under section 5.3, Microsoft "acquire[d] additional license rights to the Embedded Product." (Agreement § 5.3 (Dkt. No. 211-2 at 9).) Microsoft was permitted "to exercise any and all rights of ownership" including "the rights to make, use, reproduce, disclose, modify, adapt, create derivative works based on or incorporating some or all of the Embedded Product[,]" though it was not permitted to create derivative works of the Embedded Product using the Veritas Add-on Product Code Subset (AOPCS). (Agreement § 5.3 (Dkt. No. 211-2 at 9).)

Whether Microsoft used AOPCS to develop LVM is not a question that may be resolved on summary judgment; it is a factual issue that must be determined by the fact-finder. Further, Veritas argues that the buy-out provision did not entitle Microsoft to use Veritas' confidential information to supplant LDM, it merely gave Microsoft the right to modify LDM. (Pl.'s Resp. 11 (Dkt. No. 291 at 14).) Again, whether LVM was a modification of LDM or a supplanting product is for the jury to determine.

Veritas asserts that Microsoft knew that the buy-out did not afford it all the rights it needed to legally distribute Windows Vista and Windows Server 2008; otherwise, Microsoft would not have tried to waive its buy-out rights in exchange for broader rights during the Framework negotiations. (Pl.'s Resp. 11–12 (Dkt. No. 291 at 14–15).) Veritas points to an April 2004 draft of the Framework Agreement as an acknowledgment by Microsoft that the buy-out would not "cleanse the prior breaches of the Agreement." (Pl.'s Resp. 12 (Dkt. No. 291 at 15).) The Framework Agreement draft recitals state that Microsoft included certain volume management technology in its products and that Microsoft did not have "all appropriate rights to that technology[.]" (Framework Agreement Recitals (Dkt. No. 296-6 at

ORDER – 14

55).) If the buy-out provided retroactive rights to Veritas' confidential information, Veritas argues, there would have been no need for Microsoft to negotiate for those retroactive rights during the Framework negotiations. (Pl.'s Resp. 12 n.40 (Dkt. No. 291 at 15).) The Court finds that Microsoft has not carried its burden at the summary judgment stage of showing that there are no genuine issues of material fact as to whether the buy-out provision entitled it to develop LVM using Veritas' confidential information.

### C. Whether the Agreement's Limitation of Liability Provision Bars Veritas' Recovery of Any Lost Profits and Otherwise Caps Damages at $4 Million

The Agreement's limitation of liability provision states that:

> Neither party shall be liable hereunder for any loss of data, *profits* or use of the products, or for any special, incidental, indirect or consequential damages arising out of or in connection with the use or performance of the VM Software, Veritas Products or Related Services, Microsoft System Product, or other Microsoft Products or related services. In no event will Veritas be liable hereunder to end users or resellers of Microsoft for any damages whatsoever. *With the exception of* liability of either party under Section 14 (on indemnification) and *breaches by either party of restrictions under this agreement on its use or disclosure of the source code of the other party*, the maximum liability of either party to the other under this agreement shall be the greater of $1,000,000 or the dollar amount of payments Veritas has received from Microsoft.

(Agreement § 17 (Dkt. No. 211-2 at 23) (emphasis added).)

Microsoft argues that this provision bars Veritas' recovery of lost profits and also caps Veritas' damages, if any, at $4 million, which is the amount of payments that Veritas has received from Microsoft. (Def.'s Mot. 28 (Dkt. No. 210 at 29).) Veritas counters that the damages cap does not apply to Microsoft's breaches of restrictions on the use or disclosure of Veritas' confidential information. (Pl.'s Resp. 29 (Dkt. No. 291 at 32).) The Court finds that, as discussed above, determining whether and the extent to which Microsoft misused or improperly disclosed Veritas' source code is a determination that must be made by the fact-finder and is not appropriate for disposition at summary judgment. Therefore, the Court cannot determine at this stage whether the damages cap will apply.

The Court, however, is persuaded that Veritas may not recover lost profits, because Veritas has expressly contracted away its right to recover them in the limitation of liability provision quoted above. Veritas has not disputed this issue in its response brief. (Def.'s Reply 13 (Dkt. No. 333 at 16).)

ORDER – 15

**D.    Whether Veritas' Tort Claims are Barred Under the Economic Loss Rule**

As the Court noted above, the parties have briefed the tort claims issue more fully as related to Microsoft's motion for summary judgment on Counts I, III–V, VII (Dkt. No. 212), and accordingly, the Court reserves its ruling as to that issue until the Court fully considers that motion.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby DENIES IN PART and GRANTS IN PART Microsoft's motion for summary judgment on Veritas' breach of contract claims, as follows:

Microsoft's request that the Court dismiss Veritas' claim that Microsoft breached the Agreement by including features in Windows Vista and Windows Server 2008 that are exclusively reserved to Veritas is hereby DENIED;

Microsoft's request that the Court dismiss Veritas' claim that Microsoft breached the Agreement by impermissibly using Veritas' confidential information to develop LVM, VDS, and VSS is hereby DENIED;

Microsoft's request that the Court find that the Agreement bars Veritas' recovery of lost profits is hereby GRANTED;

Microsoft's request that the Court find at this stage that the Agreement caps Veritas' damages at $4 million is hereby DENIED; and

the Court RESERVES its ruling on whether Veritas' tort claims are barred under the Economic Loss Rule, pending its consideration of Microsoft's motion for summary judgment on Counts I, III–V, VII (Dkt. No. 212).

DATED this 24th day of January, 2008.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER – 16