UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VERITAS OPERATING CORPORATION,  a
Delaware corporation,

Plaintiff,

v.

MICROSOFT CORPORATION, a Washington
corporation,

Defendant.

CASE NO. C06-0703-JCC

ORDER

MICROSOFT CORPORATION, a Washington
corporation,

Counterclaim Plaintiff,

v.

VERITAS OPERATING CORPORATION,  a
Delaware corporation, and VERITAS
SOFTWARE CORPORATION, a Delaware
corporation,

Counterclaim Defendants.

ORDER – 1

This matter comes before the Court on Defendant/Counterclaim Plaintiff Microsoft Corporation (Microsoft)'s Motion for Summary Judgment on Counts I, III-V, VII (Dkt. No. 212), Veritas Operating Corporation (Veritas)'s Response opposing the motion (Dkt. No. 289), and Microsoft's Reply (Dkt. No. 332). The Court has carefully considered these papers and their supporting declarations and exhibits and has determined that oral argument is not necessary. The Court hereby GRANTS IN PART and DENIES IN PART the motion and rules as follows.

## I.    BACKGROUND

The facts pertinent to this motion overlap with those summarized in the Court's Order of January 24, 2008 (Dkt. No. 398). Accordingly, the Court will not recount them here except as necessary to explain its decision.

## II.    APPLICABLE STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the moving party meets this initial burden, then the party opposing the motion must set forth facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "In response to a summary judgment motion, . . . the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, . . . which for the purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); FED. R. CIV. P. 56(e). If the nonmoving party fails to establish the existence of a genuine issue of material

ORDER – 2

1  fact, "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

2  317, 323–24 (1986).

3  **III.    ANALYSIS**

4    **A.    Trade Secret Misappropriation**

5    Microsoft seeks to dismiss Veritas' claim of trade secret misappropriation[1] under the Washington

6  Uniform Trade Secrets Act ("WUTSA"), WASH. REV. CODE § 19.108.010, *et seq.*, on grounds that: 1)

7  Microsoft's actions were entirely consistent with its contractual obligations regarding Veritas'

8  confidential information, and therefore, Microsoft could not have engaged in trade secret

9  misappropriation; 2) the allegedly misappropriated information is not a "trade secret" under WUTSA; and

10  3) Washington's Economic Loss Rule precludes Veritas from bringing its trade secret misappropriation

11  claim because the parties contracted for remedies in the event of a breach of the obligation not to disclose

12  confidential information. (Def.'s Mot. 4–10 (Dkt. No. 212 at 5–11).) The Court is not persuaded, at this

13  stage, by any of these arguments.

14     **1.    Whether Microsoft's Actions Were Within the Scope of Its Original Licenses or Its Rights under the April 2004 Buy-Out**

15    The Court has already found that it is unclear at this stage whether Microsoft developed Logical

16  Volume Manager (LVM), Virtual Disk Service (VDS) and Volume Shadow Copy Service (VSS) in

17

18  _____

19  [1] Veritas claims that Microsoft:

20  improperly used and publicly disclosed certain Veritas trade secrets that Veritas had
disclosed to Microsoft in accordance with the Agreement. Microsoft used Veritas trade

21  secrets in order to develop and include in Windows NT and subsequent operating system
products certain features that were reserved exclusively to Veritas under the Agreement.

22  Microsoft also misappropriated Veritas trade secret information by using such information
to create and incorporate LVM, VDS and VSS into Microsoft's operating system

23  products. Microsoft also improperly used and publicly disclosed certain Veritas trade
secrets by incorporating them into the patent applications that issued as the Microsoft

24  Patents.

25  (Compl. ¶ 56 (Dkt. No.1 at 21).)

26  ORDER – 3

accordance with Microsoft's contractual obligations, in light of the Agreement's arguable restrictions on Microsoft's use of Veritas' confidential information. (Order of Jan. 24, 2008 (Dkt. No. 398).) Whether LVM, VDS and VSS contain or were designed with the use of Veritas' confidential information hinges on a highly technical examination of code and requires the weighing of expert testimony. Because the Court cannot rule on summary judgment whether Microsoft breached the Agreement, the Court cannot determine whether a lack of breach indicates that Microsoft did not engage in trade secret misappropriation in developing LVM, VDS and VSS.

### 2.   Whether the Alleged Misappropriations Involve "Trade Secrets"

To succeed on its trade secret claim, Veritas must prove the existence of a "trade secret" within the statutory definition. A "trade secret" is:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

WASH. REV. CODE § 19.108.010(4). The Complaint does not specify precisely which trade secrets allegedly were used to create and incorporate LVM, VDS and VSS into Microsoft's operating systems. However, Microsoft focuses on the "common interface" technology of the VDS and VSS products and argues that the allegedly misappropriated source code constituting such technology in VDS and VSS was generally known and was readily ascertainable by proper means (i.e., not novel). (Def.'s Mot. 7 (Dkt. No. 212 at 8).) Further, according to Microsoft, Veritas did not engage in reasonable efforts to keep such information confidential. (*Id.*) Moreover, Microsoft argues, there are no other possible trade secrets in VSS or VDS beyond the common interface technology. (Def.'s Mot. 9 (Dkt. No. 212 at 10).)

Veritas argues that the LDM source code contains numerous trade secrets that have never been publicized by Veritas and that have been misappropriated by Microsoft. (Pl.'s Resp. 9 (Dkt. No. 289 at 15).) In particular, Veritas points to its supplemental answers to Microsoft's First Set of Interrogatories, in which Veritas identifies twenty-five algorithms and code sequences that it argues qualify as confidential

ORDER – 4

information that Microsoft allegedly used in developing LVM. (Supplemental Answer to Interrog. No. 4 (Dkt. No. 293-3 at 10–15).) Furthermore, Veritas argues, Microsoft's motion mischaracterizes Veritas' trade secret claims; Veritas is not arguing that the "common interface" feature of the VDS and VSS products are trade secrets. (Pl.'s Mot. 11 (Dkt. No. 289 at 17).) Rather, Veritas' claim against the VDS/VSS framework is that Microsoft's use of Veritas' *proprietary* and *private* interfaces and related confidential information in the development of VDS and VSS was a misappropriation and competes with Veritas' Add-on products. (Pl.'s Resp. 11 (Dkt. No. 289 at 17).) Veritas supports this claim with the expert testimony of Dr. Jeffrey Chase, a Computer Science Professor at Duke University, who states in part that the VSS/VDS code "makes some use of Veritas' proprietary on-disk structure and proprietary interfaces for manipulating such structures." (Chase Report at ¶ 19 (Dkt. No. 296-3 at 13).) Dr. Chase also states that "the implementation of these interfaces [in VSS] access functions from LDM, and exposed those functions as a programmatic management API for a product that competes with Veritas add-on products." (*Id*. ¶ 163 (Dkt. No. 296-3 at 90).) Dr. Chase's report contains some technical analysis supporting Veritas' claim that VSS code and VDS code were developed using confidential LDM source code information. (Dkt. No. 296-3 at 89–95).)

The Court is not persuaded at this stage by Microsoft's arguments regarding the absence of trade secrets in LVM, VSS, and VDS. Because Veritas does not claim that the common interface technology of VDS and VSS is protected by trade secret law, the Court sees no need to address Microsoft's specific arguments regarding the alleged lack of novelty or publication of that technology. Additionally, based on the expert testimony that Veritas has put forward to substantiate its claims that VDS and VSS do contain trade secrets, the Court finds that genuine issues of material fact exist. The Court is not persuaded by Microsoft's argument that neither VDS nor VSS contains any possible Veritas trade secrets other than the concept of a common interface, since Veritas has provided sufficient evidence to withstand summary judgment that Veritas' private interfaces and other information in LDM were trade secrets. Moreover, "the determination in a given case whether specific information is a trade secret is a factual question." *Ed*

ORDER – 5

*Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941 (Wash. 1999). The Court finds that whether the private interfaces and other information were trade secrets is properly left for the jury to decide.

### 3.   Whether Veritas' Statutory Trade Secret Misappropriation Claim Is Barred by the Economic Loss Rule

Microsoft argues that, regardless of the merits of the misappropriation issue, Veritas cannot bring both breach of contract and trade secret misappropriation claims for economic loss because under Washington law, the so-called "economic loss rule" precludes recovery for losses that are redressable by contract remedies. (Def.'s Mot. 10 (Dkt. No. 212 at 11).)  The Court is not persuaded that the economic loss rule applies here.

Under Washington law, the economic loss rule sometimes applies:

> to hold parties to their contract remedies when a loss potentially implicates both tort and contract relief. . . . The rule prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract because tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.

*Alejandre v. Bull*, 153 P.3d 864, 867–68 (Wash. 2007) (internal quotations omitted). The rule generally provides that "when the damages complained of are 'purely economic' (that is, there is no property damage or personal injury), and the parties either allocated the risk of loss between them, or had the opportunity to do so, the plaintiff is limited to contract remedies rather than tort remedies." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASH. PRAC., TORT LAW AND PRACTICE § 0.16 (3d ed. 2007) (citing *Alejandre*, 153 P.3d at 864).

However, "the economic loss rule does not automatically preclude all tort claims simply because a contract existed between the parties." *Davis v. Wells Fargo Home Mortgage*, No. 34136-1-II, 2007 WL 2039077, at *4 (Wash. Ct. App. July 17, 2007). The Washington Court of Appeals has explained that the judicially created economic loss rule:

> evolved in [an arena] in which the legislature had not spoken. Where the legislature has acted to create rights and remedies, courts cannot enlarge or restrict those rights or remedies unless the statute is unclear and we are confident our interpretation is consistent with legislative intent.

ORDER – 6

1   *Park Ave. Condo. Owners Ass'n. v. Buchan Devs., LLC*, 71 P.3d 692, 698 (Wash. Ct. App. 2003); *see*

2   *also*, *e.g.*, *Ruebel v. Camano Island Realty, Inc.*, No. 58533-9-I, 2007 WL 2823285, at *7 n.8 (Wash.

3   Ct. App. Oct. 1, 2007) (noting that where a statutory-based remedy allowed a plaintiff to recover

4   damages, the economic loss rule did not apply).

5          The Court has not found any Washington cases explicitly addressing whether the economic loss

6   rule may apply to bar a statutory trade secret misappropriation claim; however, the Court agrees with the

7   sound reasoning of at least one other jurisdiction that has held that the rule does not bar such a claim. *See*

8   *New Lenox Indus., Inc. v. Fenton*, 510 F.Supp. 2d 893, 909 (M.D. Fla. 2007) (holding that a FUTSA

9   claim was not barred by the economic loss rule, even though the claim was indistinguishable from a

10  breach of contract claim, because under Florida law, the economic loss rule does not bar statutory causes

11  of action). The Washington cases cited above suggest that similarly, under Washington law, the economic

12  loss rule would not bar Plaintiff's statutory WUTSA claim. Accordingly, the Court will not dismiss

13  Plaintiff's trade secret misappropriation claim on this basis.

14          **B.      Breach of the Implied Covenant of Good Faith and Fair Dealing**

15         Microsoft argues that Veritas' claim for breach of the implied covenant of good faith and fair

16  dealing[2] is precluded for two reasons: 1) the claim merely duplicates Veritas' breach of contract claim;

17  and 2) Veritas fails to allege a failure to act in good faith. (Def.'s Mot. 11 (Dkt. No. 212 at 12).)

18         The Court is unpersuaded by Microsoft's arguments because Veritas not only claims that

19  Microsoft breached its contractual obligations but also that it did so surreptitiously, with a deliberate

20  intention to mislead Veritas and thereby deny Veritas the benefit of its bargain. (Compl. ¶ 1, 36, 37 (Dkt.

21  No. 1).) In its Response, Veritas provides some evidence that Microsoft intentionally breached the

22  Agreement and that "Microsoft engaged in a concerted, multi-year effort to conceal its unlawful actions

23

24          [2] Under Washington law, "[t]here is in every contract an implied duty of good faith and fair
    dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full
25  benefit of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).

26  ORDER – 7

on multiple fronts by withholding critical evidence of its misconduct from Veritas." (Pl.'s Resp. 17 n.73 (Dkt. No. 289 at 23).) For example, a 1998 email from Microsoft's Kevin Phaup states that Felipe Cabrera, one of Microsoft's managers of the LDM project:

> admitted that his intention is to eventually get [Veritas] out of the box because he believes we should not rely on any 3rd party for core components. . . . He also says he doesn't care a damn about the contract because he wasn't involved, and we should just lie to them that we are doing this for performance reasons[.]

(Phaup Email Jan. 15, 1998 (Dkt. No. 296 at 5).) In another example, a 2001 email from Microsoft's general manager Ben Fathi states that "[w]e should be clear amongst ourselves that Veritas is a competitor. We will work with them as opportunities arise, but opening our kimono is out of the question." (Fathi Email Feb. 19, 2001 (Dkt. No. 296 at 76).)

Additionally, some evidence supports Veritas' allegation that Microsoft deliberately included "blocking" code to conceal its inclusion in LVM of certain features that may have been reserved for Veritas' Add-on Products. (Chase Report ¶ 79–82 (Dkt. No. 296-3 at 50–51); Teodorescu Dep. 37:11–38:2 (Dkt. No. 296 at 116–17).) Moreover, Veritas offers some evidence that Microsoft denied Veritas access to design documents and version histories for VSS and VDS, in an attempt to conceal its contractual breaches. For example, one of the LVM design documents includes information regarding the inclusion and blocking of certain features arguably reserved for Veritas Add-on Products, and states that the document "should not be disclosed to any vendor (including Veritas) at this time." (Microsoft Document "Volmgmt Driver" (Dkt. No. 296-2 at 2).) In addition, a 2002 email from Veritas' Eric Burneger memorializes that Veritas repeatedly asked Microsoft for, and was denied, access to source code for what would become Windows 2003 Server, which was to include LDM code. (Burgener Email Oct. 7, 2002 (Dkt. No. 293 at 4).) Under the Agreement, Microsoft was obligated to provide Veritas with modified source code so that Veritas could maintain compatibility with its Add-on Products. (Agreement § 3.5 (Dkt. No. 211-2 at 7).) Building an Add-On Products business was Veritas' express objective in entering the Agreement in the first place. (Agreement Recitals (Dkt. No. 211-2 at 2).)

ORDER – 8

Veritas has raised at least a genuine issue of material fact as to whether Microsoft breached the implied duty of good faith and fair dealing. Moreover, the Court will not hold the economic loss rule to bar a claim for breach of the implied duty of good faith and fair dealing. It would defy logic to find that this type of claim is precluded by the existence of a contract, given the fact that Washington law clearly recognizes the duty and requires the existence of a valid contract in order for it to apply. *See Badgett*, 807 P.2d at 360 ("The duty to cooperate exists only in relation to performance of a specific contract term.").

### C.    Unfair Competition

Microsoft argues that Veritas cannot prove its unfair competition claim because there is no evidence that Microsoft deceptively "passed off" Veritas' products as its own. (Def.'s Mot. 13 (Dkt. No. 212 at 14).) Veritas' common law unfair competition claim is based not on "passing off," however, but rather on allegations that Microsoft: (1) included features in its operating system products that are exclusively reserved for Veritas under the Agreement; (2) failed to provide Veritas with information and code updates; and (3) failed to comply with its contractual obligations to respect the confidentiality of Veritas' trade secret and confidential information.[3] (Compl. ¶ 70 (Dkt. No. 1).)

Veritas has not identified, nor has the Court found, controlling precedent under Washington law upholding a common law unfair competition claim based, like Plaintiff's claim, on breach of contract.[4] The most relevant authority that this Court has found is a footnote in a 1973 Washington Supreme Court case stating that "[t]here can also, at common law, be an action for unfair competition based upon breach

---

[3] Contrary to Microsoft's assertion that only the first two allegations remained after this Court's October 31, 2006, Order (Dkt. No. 60), the Order dismissed only that portion of the unfair competition claim regarding "other obligations."

[4] The common law regarding unfair competition for misappropriation of a trade secret has been displaced by WUTSA. WASH. REV. CODE § 19.108.900(1); *Petters v. Williamson & Assoc., Inc.*, No. 49236-5-I, 2003 WL 457823, at *11 (Wash. Ct. App. 2003) (affirming dismissal of a misappropriation-based common law unfair competition claim as not appropriate as an independent basis for liability).

ORDER – 9

of contract." *Seaboard Sur. Co. v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 504 P.2d 1139, 1141 n.2 (Wash. 1973). Additionally, in an unreported Washington Court of Appeals opinion, the court held that a breach of contract claim was sufficient to support a common law unfair competition claim, and pointed to the Restatement (Third) of Unfair Competition, Section 38, for the proposition that "[o]ne who causes harm to the commercial relations of another by appropriating the other's intangible trade values is subject to the other for such harm only if: . . . (c) the appropriation . . . is actionable as a breach of contract[.]" *Wade Cook Seminars, Inc. v. Mellon*, No. 42054-2-I, 1999 WL 211831, at *5 (Wash. Ct. App. Apr. 12, 1999).

Microsoft, by contrast, points to an unreported order in this district that finds that under Washington law, "common law unfair business competition claims are limited to what was referred to in England as claims for 'passing off.'" *Childers v. Sagem Morpho, Inc.*, No. C06-0060, 2006 WL 3734151, at *5 (W.D. Wash. Dec. 15, 2006) (citing *Ivan's Tire Serv. Store, Inc. v. Goodyear Tire & Rubber Co.*, 517 P.2d 229, 122 (Wash. Ct. App. 1974) (describing the common law concept of unfair competition as "passing off" one's goods as those of a competitor)). In such a case, the damages that could be recovered included:

> lost profits, losses due to reduction in prices occasioned by the competition, harm to reputation, and expenditures reasonably made by the plaintiff to prevent prospective customers from being misled by the defendant's conduct.

*Ivan's Tire Serv. Store, Inc. v. Goodyear Tire & Rubber Co.*, 517 P.2d 229, 126 (Wash. Ct. App. 1974). Veritas makes no allegation that it has suffered these kinds of damages from "passing off."

It is not entirely clear how Veritas articulates and supports its unfair competition claim. Other than identifying the breach of contract-related unfair competition claims in its Complaint, Veritas addresses its unfair competition claim only to the extent that it opposes Microsoft's argument that the economic loss rule precludes the tort claim. (Pl.'s Resp. 29 (Dkt. No. 289 at 35).) Veritas states that Washington recognizes the common law tort of unfair competition to "guard the standards of fairness and morality in commercial transactions," but refers the Court only generally to the Restatement (Third) of

ORDER – 10

1    Unfair Competition for guidance in construing the claim. (Pl.'s Resp. 29–30 (Dkt. No. 289 at 35–36).) It

2    does not appear that Veritas is claiming that Microsoft "passed off" Microsoft's goods as those of

3    Veritas. Rather, Veritas explains that its claim is based upon Microsoft's purposeful deception in

4    breaching its contractual obligations. (Pl.'s Resp. 30 (Dkt. No. 289 at 36).) Veritas states that "[e]ven

5    sophisticated parties to a commercial contract have the right to expect the other party to act in good

6    faith[.]" However, Veritas already has the potential to recover for such an alleged wrong under its claim

7    for breach of the duty of good faith and fair dealing. Lacking clear substantive Washington case law on

8    breach of contract-based common law unfair competition claims, and finding Veritas' explanation of its

9    claims somewhat vague and duplicative of its breach of good faith duty claim, the Court hereby

10    DISMISSES Veritas' unfair competition claim.

11        **D.    Unjust Enrichment**

12        In its Response, Veritas states that it will "not go forward on the unjust enrichment claim as a

13    separate cause of action." (Pl.'s Resp. 30 n.112 (Dkt. No. 289 at 36).) Accordingly, the Court

14    DISMISSES Veritas' unjust enrichment claim.

15        **E.    Copyright Infringement**

16        Veritas claims that Microsoft:

17        infringed Veritas's Registered Copyright Nos. TXu1272637 and TXu1272638 by
          developing, copying, making, using, offering for sale or selling various operating systems
18        products incorporating LVM. . . . LVM contains code segments that constitute copies of
          portions of Veritas's copyrighted code.
19
20    (Compl. ¶ 84 (Dkt. No. 1).) Apparently, the only portion of the LDM code that Veritas has specifically

21    identified as having been infringed[5] consists of 54 lines of code, comprising approximately 0.03 percent of

22    a code base of almost 160,000 lines. (Def.'s Mot. 25 (Dkt. No. 212 at 26).) With the possible exception

23    of two lines, Microsoft did not copy verbatim this code section; rather, Microsoft changed the code "by

24        [5] Veritas identified the allegedly infringed code portion in its Third Supplemental Answers to
      Microsoft's First Set of Interrogatories (Dkt. No. 213-2 at 37–38). Due to its complexity, the Court will
25    not reproduce the code portion here.

26    ORDER – 11

1    removing the legacy UNIX programming conventions and by upgrading the programming language to

2    C++ from the older C language in which Veritas wrote it[.]" (Def.'s Mot. 25 (Dkt. No. 212 at 26).)

3           Microsoft argues that Veritas' copyright claim cannot survive summary judgment because

4    Microsoft was licensed to use the code and, after the 2004 "buy-out," was effectively the owner of the

5    code. (Def.'s Mot. 24 (Dkt. No. 212 at 25).) Additionally, according to Microsoft, the code section

6    identified by Veritas is not protected by copyright law because it is functional, in the public domain, and

7    *de minimis*. (Def.'s Mot. 25 (Dkt. No. 212 at 26).) Microsoft also argues that Veritas has not put forth

8    evidence demonstrating that the two code sections are substantially similar. (Def.'s Mot. 27 (Dkt. No.

9    212 at 28).) Finally, Microsoft argues that Veritas' copyright claim is untimely.[6] (Def.'s Mot. 30 (Dkt.

10   No. 212 at 31).) Each of these arguments is addressed in turn, below.

11          **1.**      **Whether Microsoft is Licensed to Use the Code or Is Its Effective Owner**

12          Microsoft concedes that when a party exceeds the scope of a license, it can be held liable for

13   copyright infringement. (Def.'s Mot. 25 (Dkt. No. 212 at 26) (citing *Sun Microsys., Inc. v. Microsoft*

14   *Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999).) The Court has already found that whether or not

15   Microsoft's actions were within the scope of the Agreement is a fact question that remains for the jury.

16   Accordingly, it will not grant Microsoft's motion for summary dismissal of the copyright claim on this

17   basis.

18          **2.**      **Whether the Code at Issue is Protected by Copyright Law**

19          To succeed on its copyright infringement claim, Veritas will have to prove that Microsoft "copied

20   protected elements of [Veritas'] work." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.

21   2000), *cert. denied*, 531 U.S. 1126 (2000). Absent direct evidence of copying, such as an admission that

22   defendant copied the work at issue, this factor is normally proven by circumstantial evidence of

23   defendant's access to plaintiff's work and substantial similarity between the works. *Id*. Before the Court

24   

25         [6] The Court addresses the timeliness issue in Section III.F below.

26   ORDER – 12

1    reaches the substantial similarity analysis, however, the Court must first filter out any non-protected

2    material from the purportedly protected expression. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d

3    693, 710 (2d Cir. 1992). As to whatever "golden nugget" of protected expression in the LDM code

4    remains, the Court will then consider whether it is substantially similar to the allegedly infringing LVM

5    code. *Id.*

6                                   **i.      Non-Protected Elements**

7         The section of code allegedly infringed, by both parties' accounts, is a "transaction macro."

8    (Def.'s Mot. 26 (Dkt. No. 212 at 27), Pl.'s Resp. 26 (Dkt. No. 289 at 32).) Veritas' expert Dr. Chase

9    describes transaction processing as a "transactional update and recovery in the implementation of

10   configuration changes to disk groups or packs." (Chase Report ¶ 102 (Dkt. No. 296-3 at 61).) As best

11   the Court can determine, the transaction macro essentially works to preserve data and prevent its loss in

12   the event of a range of hardware or software failures. Dr. Chase opines that "[t]his core code to store,

13   update, and recover disk group configurations safely is crucial to the value of the software in an

14   enterprise setting." (*Id.*)

15        Under copyright law, even as to software code, "functional elements and elements taken from the

16   public domain do not qualify for copyright protection." *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982

17   F.2d 693, 714 (2d Cir. 1992). Microsoft argues that the transaction macro was "required to maintain

18   functionality with the Defined Interface, as required by the Agreement," and as such, constitutes a

19   functional, non-protected element of the allegedly infringed work. (Def.'s Mot. 26 (Dkt. No. 212 at 27).)

20   However, Veritas' expert Dr. Chase states that copying the transaction macro "was not necessary to

21   maintain compatibility with the LDM on-disk structures." (Chase Report ¶ 96 (Dkt. No. 296-3).) As a

22   result, whether the transaction macro is a functional element is a disputed material fact.

23        Additionally, Microsoft argues that similar transaction macros have been in the public domain for

24   decades, and that therefore the transaction macro at issue is not protected by copyright. (Def.'s Mot. 26

25   (Dkt. No. 212 at 27).) Veritas' expert, however, has stated that the transaction macro was a proprietary

26   ORDER – 13

feature that was developed by Veritas over many years. (Chase Report ¶ 103 (Dkt. No. 296-3 at 62).)

Even Microsoft's expert, Dr. Gary Nutt, recognizes that the transaction macro is crucial to the value of

the product and stated that he was not aware of the publication of the macro:

> Q:   I am asking you whether you are aware of any publication by Veritas or anyone
>      else of the unique implementation details associated with the transactions
>      technology in LDM?
>      . . .
> A:   I would repeat that I am unaware of any source code being published, any of
>      Veritas' LDM source code appearing in publication.

(Nutt Dep. 51:3–13, 145:4–7 (Dkt. No. 296-4 at 15, 41).) It may be that similar transaction macros were

common in computer science, as Microsoft contends, (Def.'s Mot. 26 (Dkt. No. 212 at 27)), but there is

at least a genuine issue of material fact on this issue.

Finally, Microsoft's argument that the alleged copying is *de minimis* is unpersuasive:

> [E]ven a quantitatively small amount of copied material may be sufficiently important to
> the operation of plaintiff's program to justify a finding of substantial similarity. For
> instance, a small portion of the structure or code of a program may nonetheless give it
> distinctive features or may make the program especially creative or desirable. In such a
> case, a finding of substantial similarity would be appropriate.

4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.03(F)(5). In the instant case, as

noted above, Veritas' expert has opined that the transaction macro at issue makes the disputed

technology more "desirable" because it is "robust against a range of adverse events that might occur" and

"is crucial to the value of the software in an enterprise setting." (Chase Report ¶ 102 (Dkt. No. 296-3 at

61).) Microsoft's expert agrees with that characterization. (Nutt Dep. 145:5–7 (Dkt. No. 296-4 at 41).)

Accordingly, the Court will not dismiss the copyright claim on *de minimis* grounds.

### ii.   Substantial Similarity

Finding no reason at this stage to filter out any of the allegedly infringed material as non-

protected, the Court must consider whether Microsoft infringed Veritas' copyrighted LDM code by

copying it in LVM. "[P]roof of infringement involves fact-based showings that the defendant had 'access'

to the plaintiff's work and that the two works are 'substantially similar.'" *Three Boys Music Corp. v.*

ORDER – 14

1    *Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), *cert. denied*, 531 U.S. 1126 (2000) (quoting *Smith v.*

2    *Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996)). In the instant case, it is undisputed that Microsoft had

3    access to Veritas' LDM source code. (Def.'s Contract Mot. 2 (Dkt. No. 210 at 3); Compl. ¶ 18 (Dkt.

4    No. 1 at 7).) "Where a high degree of access is shown, [the Ninth Circuit] require[s] a lower standard of

5    proof of substantial similarity." *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004). Accordingly,

6    Veritas' burden of proof of substantial similarity is lowered.

7        The Ninth Circuit has explained that:

8    In determining whether two works are substantially similar, we employ a two-part
     analysis: an objective extrinsic test and a subjective intrinsic test. For the purposes of
9    summary judgment, only the extrinsic test is important because the subjective question of
     whether works are intrinsically similar must be left for the jury. . . . The extrinsic test
10   considers whether two works share a similarity of ideas and expression as measured by
     external, objective criteria. . . . The extrinsic test requires analytical dissection of a work
11   and expert testimony.

12   *Id.* at 845 (internal citations omitted). The Court may find that Veritas has satisfied the extrinsic test if it

13   has provided "indicia of a sufficient disagreement concerning the substantial similarity of the two works."

14   *Id.* at 846 (internal citation and brackets omitted).

15       Microsoft posits that Veritas has "offered no evidence at all—let alone expert testimony—to

16   substantiate its copyright infringement claim." (Def.'s Mot. 29 (Dkt. No. 212 at 30).) The Court

17   disagrees. Veritas' expert Dr. Chase opined, after analyzing the code sections at issue, that:

18   The transaction macro code in the Microsoft LVM code (Build 5245) is nearly identical in
     syntax, code sequence and structure compared to the transaction macro code in the
19   Veritas LDM code. The macro definition and usage are idiosyncratic, so it is unlikely that
     this occurred by chance. On further analysis of earlier versions of the source code (in
20   MSM-VRTS 030) shortly after the macros were introduced in change version 025706
     dated 10/4/2001, it becomes apparent that these transaction macros were copied from the
21   Veritas code with very minor changes. The more significant differences in the LVM
     transaction macros were introduced much later in change version 124809 dated
22   12/8/2004, and were related to the disk quorum recovery scheme that Microsoft
     introduced into LVM.

23   (Chase Report ¶ 121 (296-3 at 70).) Further, Microsoft's expert Dr. Nutt stated that the changes to the

24   transaction code from LDM to LVM were "not major." (Nutt. Dep. 116:2–3 (Dkt. No. 296-4 at 28).)

25

26   ORDER – 15

1    Dr. Nutt identified similarities between the two sets of code, including:

2        the same basic structure. They are both macros that start out #define, it's a programming
         language construct. They then interloop in the two macros and do search and work. In the
3        LVM case there is an explicit allocation of the abort variable. There is in both. There is a
         pointer to a client transaction in the LDM case that's different, but there is still the front
4        half of a loop . . . .

5    (*Id.* at 117:13–24.)  Bearing in mind Veritas' lowered burden of proof given Microsoft's high degree of

6    access, the Court is persuaded that Veritas has satisfied the extrinsic test to survive summary judgment.

7        **F.    Whether Veritas' Trade Secret Misappropriation Claim, Claim for Breach of the
                 Duty of Good Faith and Fair Dealing, or Copyright Claim is Barred by the Three-
8                Year Statute of Limitations and the Related Equitable Doctrines of Estoppel,
                 Waiver, and Laches**

9
10       Microsoft argues that Veritas' claims for misappropriation, breach of the duty of good faith and

11   fair dealing, and copyright infringement are untimely[7] because "undisputed evidence shows that Veritas

12   knew or should have known of Microsoft's now-accused activities many years before filing suit[.]"

13   (Def.'s Mot. 15 (Dkt. No. 212 at 16).) Specifically, Microsoft asserts that Veritas should have known by

14   Spring 2000 that Microsoft intended to "reintegrate LDM in a way that retained Veritas' 'IP.'" (*Id.* at

15   17.) Additionally, according to Microsoft, Veritas should have known by 2001 all of the facts giving rise

16   to Veritas' misappropriation claims relating to VDS and VSS. (*Id.* at 18–19.) Microsoft also argues that

17   Veritas should have known of any copyright infringement in 2000, "when Microsoft first informed

18   Veritas that Microsoft was creating a new version of the volume manger using LDM code." (Def.'s Mot.

19   30 (Dkt. No. 212 at 31).) Veritas filed this lawsuit on May 18, 2006. (Compl. (Dkt. No. 1).)

20       The Court finds that Veritas has raised sufficient evidence to survive summary judgment on all of

21
22       [7] Trade secret misappropriation claims must be brought "within three years after the
     misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."
23   WASH. REV. CODE § 19.108.060. Likewise, a three-year limitations period applies to claims for breach of
     the duty of good faith and fair dealing. *See Steinberg v. Seattle-First Nat'l Bank*, 832 P.2d 124, 125 n.4
24   (Wash. Ct. App. 1992). Additionally, claims for copyright infringement must be brought within three
     years after the claim accrued. 17 U.S.C. § 507(b). Accrual begins when a potential plaintiff "has
25   knowledge of a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19
     F.3d 479, 481 (9th Cir. 1994).

26   ORDER – 16

1   the timeliness issues. Veritas' Complaint and Response tell the story of a ten-year disintegrating business

2   relationship, involving years of alleged deception and obfuscation of the true facts. According to Veritas,

3   it did not discover, and could not have discovered, any of Microsoft's improper conduct until after it

4   received the latest version of Microsoft's Windows operating system code at WinHEC in early 2004.

5   (Compl. ¶ 27 (Dkt. No. 1).) Even then, Microsoft allegedly denied Veritas access to the Vista source

6   code that would have allowed Veritas to confirm its concerns that Vista included code implementing

7   ostensibly reserved features in violation of Microsoft's contractual obligations regarding Veritas'

8   confidential information. (*Id.* at ¶ 31.) It was not until October 2004 that Microsoft gave Veritas a

9   version of the Vista volume management source code (LVM) that, according to Veritas, confirmed for

10  Veritas the extent of Microsoft's misconduct. (*Id.* at ¶ 32.)

11          Veritas supports its version of the facts with evidence including a December 31, 2004, email from

12  Veritas' Vice President of Intellectual Property, Joseph Fitzgerald, to Microsoft's Craig Fielden,

13  indicating that in spite of Veritas' understanding that Microsoft was to give Veritas periodic, quarterly

14  code updates, Microsoft delayed giving Veritas the LVM code for approximately 18 months, until after

15  much discussion, negotiations, and numerous letters. (Dkt. No. 296-6 at 52).) Mr. Felden's email

16  indicates that Veritas did not receive the LVM code until sometime near the end of 2004. Veritas explains

17  in its Response that access to the LVM code was necessary for determining whether LVM contains any

18  code or trade secrets from LDM. (Pl.'s Resp. 19 (Dkt. No. 289 at 25).) In fact, Microsoft's own answer

19  to Veritas' Interrogatory Number 6[8] indicates that "a definitive answer to [the question of how much

20  LDM code was used to develop LVM] can be provided only after making a line-by-line comparison of

21  LDM and LVM code." (Microsoft's Second Supplemental Resp. to Veritas' Interrog. No. 6 (Dkt. No.

22

23  ─────────────────────

24          [8] Interrogatory Number 6 asks Microsoft to "[i]dentify any and all source code and source code
    sections from LDM that remain a part of, are in some way included in, or that were relied upon or
    utilized by Microsoft in the development of, LVM, VDS and/or VSS." (Microsoft's Second

25  Supplemental Resp. to Veritas' Interrog. No. 6 (Dkt. No. 296-6 at 38).)

26  ORDER – 17

1    296-6 at 44).) If Veritas did not receive the LVM code until near the end of 2004, Veritas could not

2    reasonably have been aware of its potential claims until that time.

3        Microsoft identifies allegedly undisputed material facts to show that:

4        Veritas knew, in the spring of 2000, everything it needed to know to file its LVM-based
         claims, including that (1) Microsoft intended to develop the next version of the Embedded
5        Product using developers who had been exposed to LDM source code, and was taking
         responsibility for implementing large numbers of bug fixes and other modifications
6        designed to eliminate the many problems that plagued the original Embedded Product, and
         (2) this project necessarily required the use of the LDM source code on which the original
7        Embedded Product was based.

8    (Def.'s Mot. 16 (Dkt. No. 212 at 17).) However, one of the main issues in this case is whether Microsoft

9    merely developed an improved Embedded Product, or whether it actually created a Supplanting Product,

10   and whether the developments Microsoft performed were just bug fixes and other modifications designed

11   to eliminate problems.

12       It is not clear to the Court that communications between Microsoft and Veritas were sufficiently

13   explicit to give Veritas reason for concern that its confidential information was being misused. The

14   exhibits Microsoft puts forward to show that there were problems with LDM during the 1997–1999 time

15   period are not sufficient to prove as a matter of law that Veritas should have known the extent to which

16   Microsoft was going to change or supplant the Embedded Product. (Def.'s Mot. 16 n.12 (Dkt. No. 212

17   at 17).) Further, Microsoft developer Catherine Van Ingen's May 16, 2002, email to Veritas' Peter

18   Benoit characterizes Microsoft's planned developments as a "reintegration" of the Embedded Product, a

19   "re-engineering to improve such things as PNP interactions." (Van Ingen Email (Dkt. No. 213-5 at 20).)

20   The email specifically states that the planned "reintegration is not a rewrite[.]" (*Id.*) This communication

21   does not suggest to the Court that Veritas should have known Microsoft was creating a Supplanting

22   Product, or that it was using Veritas' confidential information to do so.

23       Microsoft points also to Frank Artale's deposition testimony that Veritas received regular updates

24   on the reintegration from Peter Benoit, based on his conversations with Van Ingen. (Def.'s Mot. 17 (Dkt.

25   No. 212 at 18).) However, if Peter Benoit was not receiving full disclosure from Van Ingen about the

26   ORDER – 18

1    extent of the "reintegration," then whether or not Mr. Benoit gave Veritas regular updates is immaterial.

2        Moreover, Veritas alleges that Microsoft concealed its plans to compete with Veritas' Add-on

3    Products by developing the various VDS/VSS components in secrecy and by releasing them at different

4    points in time, while withholding from Veritas key design specifications and source code files. (Pl.'s

5    Resp. 20 (Dkt. No. 289 at 26).) Specifically, Veritas alleges that Microsoft concealed the critical user

6    interface (or GUI, or UI or MMC) component of VDS/VSS. (*Id.* at 21.) Veritas alleges that Microsoft

7    represented to Veritas that the VDS/VSS technology under development would be limited to an API,

8    while it secretly developed the user interface under the codename "Doppler" in order to compete with

9    Veritas' Add-on Products, including SANPoint Control. (Pl.'s Resp. 21 (Dkt. No. 289 at 27).) Veritas

10   supports these contentions in part with a Microsoft internal document dated November 5, 2002, that

11   describes VDS specifications and explicitly states that "Competition" includes "Veritas

12   SANPointControl." (Virtual Disk Service Requirements Specification 7 (Dkt. No. 293-2 at 8).)

13       Microsoft argues that Veritas knew or should have known all the facts giving rise to its claims

14   relating to VDS by 2001, in part because in 1999 Veritas obtained an 86-page VDS specifications

15   document, which allegedly provided Veritas with in-depth knowledge of the purpose, functionality,

16   structure, and source code of VDS. (Def.'s Mot. 18 (Dkt. No. 212 at 19).) However, Veritas counters

17   that this document at most involved only an early, unsuccessful, and later abandoned, API prototype, and

18   did not reveal the actual design plans and code for the VDS/VSS framework. (Pl.'s Mot. 22 (Dkt. No.

19   289 at 28).) Additionally, Microsoft argues that Veritas received a VDS software development kit in May

20   2002 (Def.'s Mot. 18 n.15 (Dkt. No. 212 at 19).) However, Veritas argues that the "so-called 'software

21   developer kits' or 'code files' that Microsoft identifies for VDS/VSS, at most, were incomplete and

22   misleading pieces of the entire VDS/VSS framework and did not contain any reference to the secret user

23   interface component[.]" (Pl.'s Resp. 22–23 (Dkt. No. 289 at 28–29).) Veritas also argues that Microsoft

24   never shared with Veritas the entire source code and design documents for the VSS/VDS framework,

25   and cites an 2002 email from Eric Burgener summarizing Veritas' source code access concerns. (Dkt.

26   ORDER – 19

1    No. 293 at 4.)

2           Reviewing the evidence the parties have put forward at this stage, the Court is not persuaded that

3    there are no genuine issues of material fact as to what Veritas knew, and when. Whether Veritas could

4    have discovered before 2004 Microsoft's misconduct in developing LVM and VSS/VDS is an intensely

5    disputed factual issue that is properly left for the jury to decide. Likewise, the Court will not now hold

6    laches, estoppel, or waiver to apply to Veritas' claims. For laches to apply, Microsoft must show that

7    Veritas had "knowledge or reasonable opportunity to discover . . . that [it] has a cause of action against

8    [Microsoft]." *Buell v. City of Bremerton*, 495 P.2d 1358, 1361 (Wash. 1972). For the reasons described

9    above, the Court is not persuaded at this time that Veritas had such reasonable opportunity to discover its

10   causes of action until 2004. Further, without reason to know that Microsoft may have been violating the

11   Agreement before 2004, Veritas could not have "intentionally and voluntarily relinquished a known right"

12   such that waiver might apply. *Jones v. Best*, 950 P.2d 1, 6 (Wash. 1998). Moreover, Microsoft has not

13   proven at this stage that Veritas made an admission, statement, or act that was inconsistent with its

14   present claims such that equitable estoppel should apply. *Carillo v. City of Ocean Shores*, 94 P.3d 961,

15   970 (Wash. Ct. App. 2004) (stating that "[e]quitable estoppel is not favored, and the party asserting

16   estoppel must prove each of its elements by clear, cogent, and convincing evidence."). The Court will not

17   hold Veritas equitably estopped from asserting its claims merely because of statements it made about

18   marketing or endorsing the anticipated product before it had access to the product's code and

19   documentation. Accordingly, the Court DENIES Microsoft's motion to the extent that it seeks to bar

20   Veritas' claims on timeliness issues.

21   **IV.    CONCLUSION**

22          For the foregoing reasons, as to Defendant Microsoft Corporation's Motion for Summary

23   Judgment on Counts I, III–V, VII (Dkt. No. 212), the Court hereby:

24          DENIES IN PART the motion as to Veritas' claims of trade secret misappropriation, breach of

25   the duty of good faith and fair dealing, and copyright infringement; and

26   ORDER – 20

1    GRANTS IN PART the motion insofar as Veritas' claims of unfair competition and unjust

2  enrichment are hereby DISMISSED.

3    DATED this 4th day of February, 2008.

4

5

6                                    John C. Coughenour
                                     UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  ORDER – 21